The next case on the dock is People v. Dye. People, it's 5-14-8, meeting 52, People v. Dye. Counselor, you ready to proceed? I'm Assistant Defender Levi Harris. I'm here on behalf of the client, Bradley Dye. May I please report, Bradley Dye is serving an 18-year sentence on the conviction for drug-induced homicide of a young fellow named Jordan Sullivan. The state's evidence in this case is insufficient to support a finding of guilty on a reasonable doubt, and we're here to ask the court to reverse the conviction. Now, the state, at trial, bore the burden of proving three elements, that my client, Bradley Dye, delivered a substance to the decedent, Jordan Sullivan, that the substance was heroin, and that Jordan died because he ingested that substance. So delivery, controlled substance, and causation. And we've already in our brief, the state fell short on all three elements, but today I want to focus especially on delivery and perhaps causation if we get to it. So as to the element of delivery, the only thing that we have, the state concedes it's circumstantial, is three, or a series of ambiguous text messages and two unreliable witnesses who are heroin addicts themselves, who are convicts, they're currently in DOC, and they have motives to testify falsely against my client. There are no eyewitnesses to this delivery, there's no admission to any reliable witness that you would usually have, like an assistant state's attorney or police officer, there's no physical evidence, and in fact, the DNA evidence that was in the case, recovered from the syringe that the young man used when he overdosed, excluded my client, Bradley Dye. So there are lots of potential other sources for the drugs that he got. First of all, the text messages, the state, both below and here, my opponent, says that they can only mean that Bradley Dye delivered this heroin. But the text messages are ambiguous. They used to be limited to 140 characters or something like that, so they're not known for fullness. Jordan Sullivan in the scene texted many people the night before he died looking for heroin. And yes, my client, Bradley Dye, offered to deliver heroin, and yes, Jordan appeared to accept that offer. But Mr. Dye testified at trial that he was not able to get that drug because his dealer, Lawrence Richardson, was out of town that night. Mr. Dye called Jordan two times after these text messages were sent for a total of about 54 seconds. And of course, we don't have any transcripts of what took place on those phone calls, but my client's explanation was that he learned that his dealer, Richardson, was out of town. And so he called to say, look, I thought I could get the drugs. Richardson's out of town. I can't get them. And he said that Jordan also told him at that time, don't worry about it, man. I think I got something else I can find for drugs. Mr. Dye's story was consistent about that in the statements that he gave to police when they initially questioned him in jail and throughout until trial. Excuse me one second. In regard to the phone calls, do you know, can you tell us what actually encompasses those 20 second phone calls? Does the time start running when the call is placed or when it is answered? Your Honor, Mr. David will correct me if I'm wrong, but I believe the testimony was that it begins the moment somebody picks up or the voicemail picks up. OK, so not while it's ringing, waiting for someone to pick up. Correct. OK, thank you. That's my understanding. Like I said, I'll look at it and if it's wrong, I'll correct that on rebuttal. Mr. Sullivan, the decedent, knew that Bradley Dye was at the home of this other guy named Brad, who unfortunately now is an overdose victim himself, because he said, oh, are you still at Brad's? Now, the only way he would know that is if he had taken Mr. Dye, my client, to this other Brad's earlier in the day as my client testified and as the state disputes. Now, Jerez Mayweather is the likely candidate for the delivery of this heroin. We know that he had heroin the night that Jordan Sullivan probably bought the heroin and killed him. We know this because testimony from Hope Eastwood that she left the guy borrowing his car, her car, earlier in the day. He left. He had the bad fortune to get pulled over, probably with heroin in his car, in Hamilton County. And police searched the car, didn't find the heroin. But he comes back. Hope Eastwood says she gets two bags of heroin out of the deal. And then about 9.30, she says, she drove Mr. Mayweather to this trailer somewhere in town. She didn't specify where. She didn't go into the trailer. Mr. Richardson goes into the trailer for a little bit, comes back out. It's a reasonable inference that this was where he was stashing the drugs. He got his heroin, hid it in this trailer, and then his little minions can come pick up the drugs and deliver them. That was at 9.30, according to Hope Eastwood. And again, this is – these witnesses are all addicts, so their timelines may not make sense. But at 9.50 p.m., 20 minutes later, Jerez Mayweather calls the decedent, Jordan Sullivan, speaks to him for several seconds. And this was 40 minutes after the last communication with Bradley Dye. So Bradley Dye testifies and calls Jordan and says, I can't get the drugs. Forty minutes later, this guy that we know had drugs called Jordan Sullivan and spoke to him. We don't know what he said because he had good sense not to do his drug deals through text messages. We also know about him that he knew that Jordan Sullivan was looking for heroin because he had smoked marijuana with Jordan earlier in the day. Jordan said he'd gotten into heroin. He didn't have any at that time. That's why he had to borrow the car and get out of town. So these text messages are ambiguous. We also have two witnesses who say, oh, I overheard Mr. Dye say he gave this stuff to this kidney overdose. One of those witnesses, Megan Story, as I said, she's a heroin addict. She's a heroin deliverer for drug dealers. She sleeps with heroin dealers for drugs. She's also a convicted felon. She had charges pending with the state at the time that she gave her testimony, although she insisted that didn't affect her testimony at all. And she also didn't like Mr. Dye, according to Mr. Dye's testimony and according to Jeremy Conley's testimony. She also had a motive to deflect blame onto somebody else for this overdose because she had a drug dealer, Lawrence Richardson, living in her house, stealing drugs out of her house. When she was probed about this on cross-examination, she said, well, I'm going to plead the fifth on that. I better plead the fifth on that. So she's one of the witnesses who said, well, I heard Brandon Dye say that he gave these drugs to Jordan Solon and he died. Jeremy Conley, the other witness, is a heroin addict. He's a convicted felon, currently in IDOC. He had the habit of loaning his car to people so that he could get drugs from them. I think the word on the street is this is a dope-fiend rental. He said that Mr. Dye, my client, and Megan Story were at his house using heroin. Oh, that's the other thing. They were all using heroin when supposedly this was overheard. And Mr. Dye testified or he told Mr. Copley that he had gotten rid of some stuff and this guy overdosed on it. But Copley says he never said, Mr. Dye never said the kid's name. Megan Story's the one who said, oh, he's talking about Jordan Solon. Megan Story denies that. Copley says this happened at his house. Megan Story says that he says that was at his house. That's a lie. That was at my house. Mr. Copley also testified that he was having sex with Megan Story at the time of this crime, this overdose. So that gives him a motive to testify falsely to put blame onto Mr. Dye so that she doesn't go to prison and so that the cops don't follow her to Lawrence Richardson, who he also gets heroin from. So these witnesses are inherently unreliable, have motives to testify falsely, et cetera, et cetera. We go back to Jerez Mayweather, who, by the way, is also in prison now, as is Lawrence Richardson. Jerez Mayweather had the heroin. He knew Jordan wanted it. He had the opportunity to deliver it or else instruct one of his middlemen to deliver it. And the timeline fits with the delivery. Briefly, Your Honors, I want to talk about causation unless you have any questions about the delivery. The state also bore the burden of causation. I think there was some confusion. Maybe that was my fault in the briefs. We're not saying that if Jordan took this heroin, some other heroin, he dies as a result of both, that that's not causation. What we're saying is if he got this heroin at 10 o'clock on Friday night, or maybe it was Saturday night, shot it up, went to bed, and then the next morning he had some other heroin from another source, injected that, and he died, that wouldn't be causation. I think that one of the citations I have is that heroin metabolizes fairly quickly over a matter of a few hours. So I think that's a smaller failure perhaps on the state's part, but we still don't have evidence on that. The evidence was insufficient to support a conviction, 18-year sentence against my client, and we asked the court to reverse. Well, wasn't there also some testimony with regard to Mr. Dye? His testimony as to what was stated between him and the defendant, or I'm sorry, the deceased, is somewhat self-serving, admittedly, that he's saying that he didn't have the drugs and that he didn't ever deliver them, when Jordan also had another dealer who had said he had the drugs and never got back to them for him. I think the state's suggestion is if he had not gotten drugs from Dye, he would have certainly gotten back to the other dealer who claimed to have it ready to be given to Jordan at that time. How do you justify that? Well, I think there are two answers to that. One is that this McDuffie, the plan was, hey, I'll help you get this heroin. You cut me in on the deal and we'll both use this heroin together. McDuffie himself testified he probably got the heroin and wanted to cut me out of the deal. So that's a reason not to call him back if you thought that you could get it from somebody else. And also, at most of the time that Jordan was ignoring this guy, he thought he had another source. He thought he had heroin from Bradley Dye up until the point in time that Bradley Dye called him and said, I don't have it. A few minutes later, Jerez Mayweather calls him, and so that gives him, he's like, okay, I've scored. I don't need to cut McDuffie into the deal. I've got it on my own. So we feel like that's a sufficient reason he would have ignored those texts. Thank you, Counsel. Apollon. Good afternoon, Your Honor. May it please the Court. Counsel, my name is Patrick Daly. I'm here on behalf of the State. The case is involving reasonable doubt. Obviously, the Court has the record. It's not going to be interested in hearing another closing argument. There's already been those below. I do want to mention a couple of legal review points as sort of a predicate. Number one, of course, this case is entirely, or virtually entirely, entirely circumstantial. Circumstantial evidence is not different than any other kind of evidence that can be used to prove a defendant guilty beyond a reasonable doubt. The Jackson standard applies regardless of whether the evidence is circumstantial or direct. Second of all, the Court's standard review is not going to try the defendant. The defendant has been tried already. Evidence now can be considered, in a way, most favorable to the State. So it's a deferential standard of review. I think thirdly, and maybe most importantly, is that there was a time when the standard review in circumstantial evidence cases that the State had to exclude every reasonable hypothesis of innocence in order to sustain a conviction. That standard review has been abandoned long ago. And therefore, you know, as long as there's evidence, credible evidence, which a trier of facts could find, the defendant committed the offense, then this Court must affirm the defendant's conviction. Can I ask you a question? Yes, sir. Was there the DNA evidence, was it admitted? It was. And that was the, didn't he have a needle stuck in his arm or something? I believe when he was found by his father, he had a needle in his arm. Okay, and is that where they got the syringe and tested out the DNA? Correct. That's correct. And was there much in that or had that been shot? I don't know if there was anything in the syringe. The only heroin that I recall that was found was actually on a spoon or on another item of paraphernalia. I mean, there was heroin tested, positive heroin tested at the scene. The syringe, I don't recall exactly if there was anything in it. But the DNA would have come off of that with the spoon. I'm sorry, Your Honor. Where did they get the... From the needle, the blood, I guess. Well, I thought it was off the syringe. Okay, that could be true. But that was admitted in the evidence. It was admitted in the evidence and it was not tied to the defendant. That's correct. Okay. It's probably a crass reduction of the evidence, but basically it really kind of comes down to this. The victim, Mr. Sullivan, was released from jail. He was at his father's throughout the course of the day. And you'll see evidence in the record of some kind of gunnings and gullings. And Mr. Mayweather shows up at one point for a while and they look at some guns and stuff. And I believe there's some testimony where Mayweather was asked, I believe by the defendant, whether he had any heroin to sell. And Mayweather said he did not, although he was probably lying because he had heroin which he gave to his father. The witness was testifying to that. In fact, that's really kind of the only communication that we have of the substantive nature between Mayweather and Sullivan in this case. Then it kind of comes down to that line of text messages and the exchange that happens, which was nicely synopsized for the court's review. It really was basically this. Heroin, right? Well, drugs. Lorotabs, I think, is what he was really looking for at the outset. He winds up in communication with two individuals, Gary McDuffie and the defendant. And this is what we're establishing from text messages. So he's sort of running two lines of communication here. McDuffie answers, yeah, I can get you some heroin. And Sullivan seems all up for that proposition. But he also is in contact with the defendant. The defendant affirmatively states, yes, I can get you heroin. And that is the offer that Sullivan accepted. Now the state's theory here, and it's a tough case, I grant you that. The state's theory alluded to by Justice Barbera is essentially this. The time and opportunity was there to get the drugs. There was a positive exchange. There was an acceptance of an offer, if you will. And then the line of communication that was currently going on between McDuffie and the defendant abruptly cut off. It was most definitely cut off because you'll see when you look at the text messages that during this time period where McDuffie is texting Sullivan, hey, what's going on? Sullivan's not answering McDuffie, but he is texting his girlfriend at the same time. So it's not like a situation where he's not getting messages. He's just ignoring them. Defendant explains this by indicating that, well, you have a reason not to call back McDuffie because McDuffie, and this is true, McDuffie apparently the communication wasn't going to cut it. I'll give you the drugs and we can kind of do it together and hang out. And I would dispute the accuracy of that proposition, but I don't know if it necessarily helps the defendant here because all it does is essentially sort of reconfirm the proposition that he had two lines of communication going for drug purges. Sure, now we know why he didn't go to McDuffie, why he didn't want to share the drugs. Now he's got, you know, the defendant who's willing to share the drugs. So, you know, I don't think that that fact that McDuffie wanted to cut necessarily alters the state's theory here or impacts negatively the state's theory about the fact that the drug deal had taken place between the defendant and Mr. Sullivan. I'm just going to go ahead and go through a couple of points that defense counsel made. And I think defense counsel did, I think, an excellent job of kind of taking the facts of a case that's full of holes and trying to poke holes in them. But again, we have a case here where the standard review is whether the evidence seen in the light most favorable to the state would support the conviction. And of course, we've got the exchange that takes place. We've got the fact that he left the residence. We've got the fact that he died of a heroin overdose and that was established medically. So from a causation standpoint, you know, the defendant here argues, well, he could have taken the drugs at point A, stopped, awoken, and taken drugs again. Sort of harkens back to where we started here. Well, what is the reason, what's the difference between a reasonable hypothesis of innocence and, you know, deference to the trial court's findings below and finding, you know, this court the light most favorable to the state. There wasn't any indication medically that that's what happened here. So the court's not required, nor is this court required, to, you know, conjure up theories which, if proven or are found in their record, would establish that the defendant is not guilty. These are all suppositions and theories and hypotheses that this court is not obligated at all to undertake as a, you know, an alternative means of Mr. Sullivan's death. That is nothing more than basically arguing that here's our reasonable hypothesis of innocence and you ought to accept it. So again, a large part of the defendant's argument here relies upon suppositions that are not going out by the record. And while they make a really good closing argument, perhaps, we're not there anymore. Now we're at the point where the deference is to the trier fact and whether the trier fact could, based on the evidence that was presented, find the defendant guilty. Number one, counsel indicates that the text messages were ambiguous. You know, the text messages speak for themselves. Text messages are not exactly, you know, Shakespearean prose, of course. But I don't believe that they are ambiguous either. I mean, you will see that there is most definitely an exchange between the defendant and Mr. Sullivan, indicating the willingness to sell drugs or willingness to get drugs for Mr. Sullivan, Mr. Sullivan accepting that, and some communications about how they're going to get together and meet up. Okay. Second of all, the defendant testified that he couldn't get the drugs from his source. This is his testimony at trial. There was nothing at all in the text messages which reflected that kind of qualification. Maybe that in and of itself doesn't mean anything. But when we consider the fact that, again, we do have a definitive exchange and we do have a definitive, you know, process that was established by the state's evidence that there was going to be something going on, we can't assume just because a call took place between the two. And, Justice Barberas, I believe that the time does start when the calls picked up. Okay. So I think that counsel is correct in every area, my recollection of the testimony. But we don't know the substance of that communication. It could be any one of the things. And, again, the court's not obligated to read into that negative implications that are not, you know, substantiated somehow in the record. They simply aren't. The argument here about the fact that the defendant was aware or there was awareness of this Brad, well, Brad is apparently a friend of the defendant's who he stays with. There's testimony to that effect. The defendant has testified actually that he ran into Mr. Sullivan earlier today around 10, 10.30 a.m., which would have been basically right after he got out of jail. And then he was driving his father's pickup truck. Well, his father testified that he had his truck with him for the entire day. So not only does it make – not only is it really accurate to state, well, okay, the defendant had to have known about, you know, whether it was his communication about Brad, if I could just finish this last thought. Really, this aspect of the testimony is very – is a very negative impact on defendant's credibility because it simply doesn't bear out both in respect to the father's testimony and really logically that he could have somehow found his truck, you know, so soon after he got out of jail and was driving around looking for drugs for his father and ran into the defendant. I will stand at the balance of my brief for the rest of my argument. Your Honor, I'm going to ask this court to adjourn. Thank you. Thank you, counsel. Rebuttal. I have one question. I'm very confused. They said the syringe was excluded. The defendant – I don't understand about the DNA. You mean the syringe – the DNA on the syringe didn't match the DNA in his system of the – No. I believe, Your Honor, what happened was it did not affirmatively match anybody, but they had a series of people that they could – Wait a minute. Okay, the DNA was taken off of what? Syringe. Okay. The plunger is my understanding of it. I don't know why anybody else's DNA would be on the needle. Okay, so that DNA didn't match what? Didn't match my client's DNA. In his body. Right. Okay. Your Honor, I think we were both wrong, maybe, about the – or not wrong but confused about the time that – what are these times reported? There are two sets of records. One is from AT&T and one is a police officer put it together based on the deceiving cell phone. So I don't know, I don't have testimony about what the deceiving cell phone, whether it – I mean, I would think it's just the time that you pick up. But AT&T says its records are based on seizure time, which is the time that it starts ringing on the receiver's end, and then they start billing at the time that you pick up. So that's handled. So what time did we get in the briefs? Well, there are two sets. Was that AT&T's records or was that – This appendix is the one that the officer prepared. Okay. And I don't remember if I included – I think I did part of the AT&T appendix, but it's definitely in the record. Okay. Yes, circumstantial evidence is evidence. Yes, the Jackson standard is the standard. It's always the case in a reasonable doubt argument. We're not saying that it's, you know, it's an uphill battle. Anytime the defendant has a conviction, you come to appellate for it. But that's what we do. State is correct. You don't have to disprove every reasonable hypothesis. But surely it can't be the case that if you have three or four reasonable hypotheses that make just as much sense as the other that you just pick one and put that guy in prison, which is what we're saying here. Essentially, Jerez Mayweather and Bradley Dine both offered to sell heroin to this guy. Several people testified in the trial. Correct. Yes. And the jury had the opportunity to assess the credibility of all those witnesses. The trial court, yes. Right. And is it safe to assume that if they were to find your client, for example, not credible on one aspect of his testimony, that they may hold that against him on all aspects of his testimony? Your Honor, I think it's not permitted to do what – it's not permitted as a matter of trial procedure to try to impeach a witness about something that is correlative or tangential, which is what we argue this here. I mean, he's talking about something that supposedly happened hours and hours before. So we don't think it's material. Even if it is, just because it conflicts with the father's testimony, the father's timeline was screwed up. You can see that in his cross-examination. It doesn't even match what we know from the text messages because he says the kid left at 8 or 8.30 and was gone for about 20 minutes. We have a text message where Jordan texts his ex-girlfriend, 10.19, and says, hey, I was just at Casey's, I'll call you. That's 40 minutes after Jerez Mayweather called him. So that's when he was out and about. At least that's what it would seem like from the text messages. Did that answer your question? Your Honor, I think that's it, unless I'm – No, I still am having – I guess I'm blind at this, I think. But you're saying that the DNA in the syringe does not match the DNA in his body. You're talking about the deceit or my client? Deceit. No, it's not in the syringe, Your Honor, I wouldn't think. I mean, I think all that would be in the syringe would be heroin and maybe the decedent's blood. I thought there was DNA of heroin. Everything has a DNA, I thought. Let me see if I can explain it. Can you explain that to me? Well, there's no DNA of heroin, Your Honor. Okay.  So there would be a chemical substance that's in there. So you're saying – I thought that the syringe was in – they pulled it out of him as he was dead. Right, they pulled the needle out, not the whole syringe. The needle. Right. Well, I thought that was hooked to the syringe. Well, it was in the syringe, but I assume when they said they recovered something – The whole thing came out. The whole thing came out. I'm assuming. Right. Okay, then they checked the DNA on his body and it doesn't match what? I don't know whether it does match or not. My client – Matches what? That's what I'm trying to figure out. Does it match the DNA that's recovered from the outside of the syringe would be my supposition. They just took it out of him. Right. So it would be his blood on the syringe. It would be the decedent's blood on the syringe. Right, the decedent's blood, right. Right, but not my client's. No, I'm not saying it would have your client's blood on it. Yeah. So what doesn't match? My client's DNA in his person is excluded. It cannot be a contributor to any DNA that was recovered from that syringe. So in other words, there's blood on the syringe. I don't think it's blood necessarily, Your Honor. It might be finger stuff. It could be sweat. So what I'm trying to figure out then is trying to say that all that shows is that your client didn't do the injection. It shows that he didn't, I would say, handle the syringe. Oh, that's what I'm trying to figure out. Okay. Any other questions, Your Honor? No, I'm finished. Thank you very much for your command and interest in the fact. Court will take this case under advisement. You'll be advised.